IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

LEE J. ADAMS, SR.,                     )     CASE NO. 1:13-cv-01788
                                       )
                  Plaintiff,           )     MAGISTRATE JUDGE
                                       )     KATHLEEN B. BURKE
            v.                         )
                                       )
COMMISSIONER OF SOCIAL                 )
SECURITY ADMINISTRATION,               )
                                       )     __MEMORANDUM OPINION & ORDER__
                  Defendant.           )

Plaintiff Lee J. Adams, Sr., ("Plaintiff" or "Adams") seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner")

denying his application for social security disability benefits.  Doc. 1.  This Court has jurisdiction

pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned Magistrate Judge pursuant to

the consent of the parties. Doc. 15.   As explained more fully below, the Court **AFFIRMS** the

Commissioner's decision.

## I.  Procedural History

Adams protectively filed[1] an application for Supplemental Security Income ("SSI") on

July 12, 2010.[2]  Tr. 10, 65, 73, 74, 82, 134-139, 148.  He alleged a disability onset date of

October 1, 1995 (Tr. 65, 74, 134) and claimed disability due breathing problems, COPD, and

---

[1] The Social Security Administration explains that "protective filing date" is: The date you first contact us about filing for benefits. It may be used to establish an earlier application date than when we receive your signed application. http://www.socialsecurity.gov/agency/glossary/ (last visited 9/8/2014).

[2] Adams had previously been granted SSI benefits in 1996.  Tr. 39-40, 194.  His benefits were terminated in 2006 because his resources from a personal injury settlement exceeded the threshold amount for SSI benefits until 2010. Tr. 39-40, 194.

digestive problems (Tr. 65, 74, 83, 91, 153).[3]  After initial denial by the state agency (Tr. 83-85),

and denial upon reconsideration (Tr. 91-97), Adams requested a hearing (Tr. 98).  On December

5, 2011, Administrative Law Judge William J. Mackowiak ("ALJ") conducted an administrative

hearing.  Tr. 23-64.

In his January 13, 2012, decision, the ALJ determined that Adams had not been under a

disability from July 12, 2010, the date the application was filed.  Tr. 7-20.  Adams requested

review of the ALJ's decision by the Appeals Council.  Tr. 195-198.  On June 20, 2013, the

Appeals Council denied Adams' request for review, making the ALJ's decision the final decision

of the Commissioner.  Tr. 1-6.

## II. Evidence

### A.    Personal, educational and vocational evidence

Adams was born in 1964.  Tr. 176.  At the time of the hearing, he was 47 years old and

was living with his wife and children.  Tr. 28, 30-31.  Adams last worked in 1996 at a factory job

making bolts on a machine.  Tr. 27-28.

### B.    Medical evidence

#### 1.  Treatment history

*Primary care physicians*

Beginning in June 2009, Adams was treated by Dr. W. Craig Eldridge.[4] M.D..  Tr. 230-

242, 250.  When Adams first saw Dr. Eldridge on June 28, 2009, he indicated that, since the

money from his motor vehicle accident was gone, he was interested in reapplying for disability.

Tr. 241.  Dr. Eldridge provided Adams with refills of his medications, including Reglan and

---

[3] Adams does not allege a mental impairment.  Tr. 13, 31.

[4] Adams had treated with Dr. Paul K. Birney, M.D., for at least 15 years until that treatment relationship ended in the early 2000's when Dr. Birney quit his practice or retired.  Tr. 34, 199.

Albuterol, ordered lab work, and advised Adams that, if he provided him with the paperwork, he would assist Adams with his application for disability.[5]  Tr. 242.  Dr. Eldridge's review of Adams' systems was negative other than for his chronic esophageal difficulties.  Tr. 241.  Adams denied any chest pain or shortness of breath.  Tr. 241.  On examination, Adams' lungs were clear to auscultation bilaterally without wheezing or rhonchi.  Tr. 242.

On May 4, 2010, Adams saw Dr. Eldridge for follow up after having been seen in the emergency room with a diagnosis of cellulitis on his left hip and gluteal.  Tr. 240.  Dr. Eldridge noted that a CT scan performed at the hospital was negative for any abscess or inflammatory changes.  Tr. 240.  On examination, Adams' lungs were clear to auscultation bilaterally without wheezing or rhonchi.  Tr. 240.

Beginning around December 2010, Adams started treating with Dr. Saima Iqbal, M.D. Tr. 248-252.  On December 8, 2010, Adams contacted Dr. Iqbal's office complaining of tightening in his chest and reporting that he thought he had pneumonia.  Tr. 252.  Dr. Iqbal's office advised Adams to come in to see Dr. Iqbal or to obtain a chest x-ray.  Tr. 252.  Adams declined.  Tr. 252.  Dr. Iqbal noted that he thought it sounded like an asthma exacerbation and Adams could increase his Albuterol but also noted that, if he had a cough, fever, fatigue, etc., he should be seen.  Tr. 252.

On May 26, 2011, Adams saw Dr. Iqbal to discuss his GERD and asthma.  Tr. 250-251, 252.  He provided Dr. Iqbal with his past medical history, which included an esophageal deformity.  Tr. 250.  Adams reported that he was born without an esophagus and had surgery done as a baby and thereafter had multiple surgeries.  Tr. 250.  Adams indicated that the doctors

---

[5] Dr. Eldridge noted that he had reviewed a letter from Adams' prior primary care physician dated October 2001 wherein Adams' doctor indicated that Adams was unemployable.  Tr. 242.

took a piece of his colon and connected it to his oral cavity.  Tr. 250.  The last surgery on his esophagus was in 1996 when his doctors removed scar tissue.  Tr. 250.

Adams reported to Dr. Iqbal that he continued to have problems, including vomiting when he sleeps and recurrent pneumonia.  Tr. 250.  Adams was taking Reglan and Nexium.  Tr. 250.  Adams was also using an Albuterol nebulizer solution which he reported doing well with.  Tr. 250.  On examination, Adams had good air entry in his lungs, his lungs were clear to auscultation, and there were no added sounds.  Tr. 250.  Dr. Iqbal's assessment included diagnoses of GERD and asthma.  Tr. 251.  He recommended trying a different dose of Nexium to see if it would help Adams with his GERD and he renewed Adams' prescription for Reglan.  Tr. 250, 251.  With respect to Adams' asthma, Dr. Iqbal renewed Adams' prescription for Albuterol nebulizer solution.  Tr. 251.

On June 15, 2011, Adams contacted Dr. Iqbal's office seeking a disability placard for his car.  Tr. 249.  On June 17, 2011, Dr. Iqbal's office advised Adams that his request would not be approved because Adams was "not obese enough, only on Albuterol INH (doesn't qualify for placard requirements)."  Tr. 249.   There are additional office notes dated June 20, 2011, and August 6, 2011, but it does not appear that Adams was actually seen by Dr. Iqbal.[6]  Tr. 249.

*Other treatment records*

In addition to seeing his primary care physicians, Adams received emergency room treatment on various occasions between December 2008 and January 2011.  Tr. 200-229, 253-272.  He was seen primarily for hip, back, knee and neck pain and was also seen for a skin infection.  Tr. 200-229, 253-272.  Also, in January 2009, Adams was evaluated by a physical therapist for issues relating to cervical strain, including headaches (Tr. 272-276) and attended

---

[6] The June 20, 2011, note states "LM" and the August 6, 2011, note states "chart together."  Tr. 249.

4

physical therapy for several weeks (Tr. 277-297).  February 2009, physical therapy notes show that Adams was showing improvement.  Tr. 291.

### 2.  Opinion evidence

*Treating physician*

On October 11, 2001, Dr. Paul K. Birney, M.D., authored a letter stating,

> Lee Adams has been a patient of mine for over 15 years.  He has severe, chronic aspiration pneumonia with difficulty swallowing due to a congenital defect of his esophagus.  He, at present, is unable to be employed and would not be likely to be able to be employed in the future.

Tr. 199.

*Consultative examining physician*

On November 12, 2011, consultative examining physician Dr. Christina Feser, D.O., evaluated Adams.  Tr. 328.  She prepared a narrative report (Tr. 328-333), completed a manual muscle testing form (Tr. 334-337), and completed a check-box Medical Source Statement of Ability To Do Work-Related Activities (Physical) ("MSS") (Tr. 338-343).

Based on Adams' medical history and Dr. Feser's physical examination, Dr. Feser indicated the following diagnoses in her narrative report (1) esophageal reflux likely secondary to anatomical defect noting that she did not have medical records to review for symptomatology and history and evolution of Adams' disease process; (2) dyspnea which she noted could be secondary to Adams' esophageal reflux, his COPD, or his obesity; and (3) history of aspiration pneumonia which she noted was most likely secondary to Adams' esophageal reflux.  Tr. 332.  Dr. Feser indicated that Adams provided his best effort during the examination.  Tr. 332.  She opined that Adams:

> [C]an be expected to sit and stand normally in an 8 hour workday with normal breaks.  The claimant has mild to moderate limitations with walking due to dyspnea.  The claimant does not need an assistive device with regards to short and

long distances and uneven terrain.  The claimant has mild to moderate limitations with lifting and carrying weight due to dyspnea.  There are limitations on repetitive bending, stooping, crouching, squatting and so on and the claimant will be able to perform these occasionally due to reflux.  There are no manipulative limitations on reaching, handling, feeling, grasping, fingering and the claimant will be able to perform these frequently.  There are no relevant communicative or work place environmental limitations.  There are some relevant visual limitations due to mildly decreased visual acuity bilaterally.

Tr. 333-334.

In the MSS form, Dr. Feser rated Adams' physical work-related abilities in various categories, opining that: (1) Adams could frequently lift or carry up to 10 pounds, occasionally lift up to 20 pounds, and never lift 21 pounds or more (Tr. 338); (2) Adams could, without interruption, sit for 3 hours, stand for 2 hours, and walk for 20-30 minutes (Tr. 339); (3) in an 8-hour day, Adams could sit for a total of 8 hours, stand for a total of 2 hours and walk for a total of 1 hour (Tr. 339); (4) Adams could frequently reach overhead bilaterally with his hands and otherwise he could use his hands continuously for all other reaching, handling, fingering, feeling and pushing/pulling (Tr. 340); (5) Adams could use his feet continuously (Tr. 340); (6) Adams could occasionally balance and never climb stairs, ramps, ladders and scaffolds, stoop, kneel, crouch, and crawl (Tr. 341); and (7) Adams could never tolerate exposure to unprotected heights; humidity and wetness; dust, odors, fumes and pulmonary irritants; extreme cold or extreme heat; he could occasionally tolerate moving mechanical parts and vibrations; and he could operate a motor vehicle continuously (Tr. 342).

In the MSS form, Dr. Feser also indicated that Adams could perform activities such as shopping; travel without a companion or assistance; ambulate without using a wheelchair, walker, 2 canes or 2 crutches; walk a block at a reasonable pace on rough or uneven surfaces; use public transportation; climb a few steps at a reasonable pace with the use of a single handrail;

prepare a simple meal and feed himself; care for his personal hygiene; and sort, handle, or use paper files. Tr. 343.

*State agency reviewing physicians*

On September 8, 2010, state agency reviewing physician Walter Holbrook, M.D., reviewed Adams' records and completed a physical RFC assessment. Tr. 68-70. He opined that Adams could lift/carry 20 pounds occasionally and 10 pounds frequently; he could stand/walk about 6 hours in an 8-hour workday, sit about 6 hours in an 8-hour workday; and he could push/pull unlimitedly, other than as shown for limitations for lift/carry. Tr. 68-69. Dr. Holbrook also opined that Adams had unlimited ability to climb ramps, stairs, ladders, ropes or scaffolds; and kneel, crouch and crawl and Adams could occasionally stoop, i.e., bend at the waist. Tr. 69. Dr. Holbrook noted that Adams' exertional and postural limitations were based on Adams' congenital esophageal repair and reflux. Tr. 69. With respect to environmental limitations, Dr. Holbrook opined that Adams should avoid even moderate exposure to extreme heat, cold, wetness, humidity or fumes, odors, dusts, gases, poor ventilation, etc. Tr. 70.

On reconsideration, on January 12, 2011, state agency reviewing physician Elizabeth Das, M.D., offered a similar physical RFC assessment and noted that there were no new or material changes in the medical evidence of record. Tr. 77-79.

**C.  Testimonial evidence**

**1.  Adams' testimony**

Adams was represented by counsel and testified at the hearing. Tr. 27-44, 62-64. At birth, his esophagus was not developed and he underwent an eight hour surgery to repair his esophagus. Tr. 31. He was on a feeding tube until his teenage years because he could not swallow. Tr. 31-32. In his early teens, he got off the feeding tube and was able to eat by mouth.

Tr. 31-32.  He then had a few good years before he started having problems and was put on disability.  Tr. 31-32.

He stated that his medical impairments include chronic obstructive pulmonary disease (COPD), gastric reflux disease (GERD), and a history of pneumonia.  Tr. 28-29.

Adams was seeing Dr. Iqbal as his primary care physician.  Tr. 34-35. However, Adams indicated he does not see a doctor very often because, since his last surgery around 1996 at University Hospitals, the doctors indicated that there was not much more that they could do for him.  Tr. 32.  The only thing that the doctors can really do is treat his symptoms, such as pneumonia. Tr. 32.

He usually gets pneumonia twice each year and it usually lasts about two weeks.  Tr. 29, 41.  He last had pneumonia early in 2011.  Tr. 32-33.  When he gets pneumonia, he usually calls his doctor and he prescribes an antibiotic.  Tr. 32-33.  Adams takes Nexium and a Raglan pill to reduce or keep down his acid.  Tr. 30.  He has an Albuterol Sulfate breathing machine which he can use up to every four hours.  Tr. 30, 35.  He noted that, when Dr. Birney treated him, Dr. Birney advised him that he could use his breathing machine every two hours if he needed to.  Tr. 35.  Adams estimates that he uses his breathing machine about three times each day at varying times.  Tr. 35.

When he is eating, food will sometimes get stuck in his throat and he gets chest pains.  Tr. 33.  He has a bulge in his neck that fills up with fluids and solid food.  Tr. 33.  Also, his breathing problems and congestion cause him to have chest pains.  Tr. 30.  It is very difficult for Adams to sleep at night because he aspirates throughout the night, meaning he vomits in his sleep because of liquid going into his lungs. Tr. 30, 36-37.  He usually ends up sitting on the floor with his head on the side of the bed.  Tr. 36.  During the day, he sleeps or does whatever

needs to be done for that day.  Tr. 30.  He also aspirates when he tries to sleep during the day.
Tr. 39.  When he aspirates, the liquid is acidic and it burns.  Tr. 42.  His voice is usually hoarse
because of the aspirations, choking and coughing.  Tr. 42.

Because of his breathing problems, he has a difficult time lifting things.  Tr. 40-41.  He
had recently tried to lift and carry a box weighing not more than 10 pounds and was unable to
carry it very far.  Tr. 40-41.  He has shortness of breath even when not carrying things.  Tr. 41.
During the hearing, for example, Adams indicated that he was getting somewhat short of breath.
Tr. 41.  He reported having had a bad night the night before; he was up all night.  Tr. 41.  He had
used his breathing machine prior to the hearing but was unable to fit in a second breathing
machine treatment before the hearing.  Tr. 41.  His shortness of breath impacts his ability to
walk.  Tr. 42.  In estimating his ability to walk on a good day, he indicated that, with breaks, he
can walk around a store like Walmart.  Tr. 42-43.  Also, because of his breathing issues, he has
problems bending at the waist or stooping.  Tr. 43.

On a really bad day, Adams tries to remain in a sitting position and he usually uses his
breathing machine every two to four hours.  Tr. 43.  He estimates having about 10 bad days per
month.  Tr. 44.

During the year prior to the hearing, Adams had not been to the hospital or required
emergency medical treatment.  Tr. 37.  However, Adams believes that his condition has gotten
worse since he was last on disability.  Tr. 40.  He indicated that his condition has not improved
during periods of sleep and he now also aspirates while he is awake.  Tr. 43.

## 2.    Vocational Expert's testimony

Vocational Expert ("VE") Mark Anderson testified at the hearing.  Tr. 44-60.  The VE indicated that he did not see any real earnings since 1991 so it did not appear that Adams had past relevant work.  Tr. 46.

The ALJ asked the VE to assume a hypothetical individual of Adams' age, education, work experience, and skill set who:

> [C]an lift up to ten pounds occasionally; stand or walk for approximately two hours in an eight hour work day; and sit for approximately six hours in an eight hour work day; with no climbing of ladders, ropes or scaffolds, occasional ramps or stairs; occasional balancing; no stooping, crouching, kneeling, crawling; avoid even moderate exposure to extreme heat and cold; avoid even moderate exposure to wetness or humidity; avoid even moderate exposure to pulmonary irritants, such as fumes, odors, dust and gasses; avoid all exposure to moving machinery; avoid all exposure to unprotected heights.

Tr. 46.  The ALJ then asked the VE whether there would be jobs in the region or national economy that the described individual could perform.  Tr. 46.  The VE indicated that there would be some sedentary, unskilled jobs available, including (1) document preparer,[7] with 32,000 jobs available in the nation, 1,200 in Ohio, and 500 in northeast Ohio; (2) touch-up screener,[8] with 57,000 jobs available in the nation, 3,500 in Ohio, and 1,000 in northeast Ohio; and (3) patcher,[9] with 10,000 jobs available in the nation, 500 in Ohio, and 225 in northeast Ohio.  Tr. 47-48.  The VE also indicated that, if the described individual was off task 20% of the time during an 8-hour workday, there would be no competitive work available for that individual. Tr. 48.

---

[7] The VE explained that a document preparer would prepare microfilm, or in today's world, burn documents to a disc.  Tr. 47, 54.  The VE later stated that he believed that there was still some microfilming being done but he believed that a majority of the work was now burning documents to CDs.  Tr. 53-54.

[8] The VE explained that a touch-up screener would inspect printed circuit board assemblies.  Tr. 47.

[9] The VE explained that a patcher would assemble electrical components.  Tr. 47.

Adams' counsel asked the VE how the restriction of no stooping in the hypothetical impacted the availability of the jobs identified by the VE.  Tr. 49.  The VE confirmed that the jobs the VE listed in response to the first hypothetical would not require stooping.  Tr. 49. Adams' counsel then asked the VE to consider an individual who "literally could not stoop on the job" and asked what impact that would have on an individual's ability to perform job duties. Tr. 49-50.  The VE responded, "literally if they couldn't stoop, I probably would provide an accommodation, one of those picker up things . . ." Tr. 50.

Adams' counsel inquired of the VE regarding the restriction of "not even moderate, moderate exposure to fumes, heat and humidity and that sort of thing."  Tr. 50.  More particularly, he asked whether there would be fumes involved with the touch-up screener position.  Tr. 50.  The VE indicated that Freon would be used to the clear the boards in the touch-up screener position.  Tr. 50-51.  The VE further stated that, according to the Dictionary of Occupational Titles (DOT), the use of Freon would not eliminate the touch-up screener position but, because Freon emits an odor, relying on his own experience, he would eliminate the touch-up screener position.  Tr. 51.

Adams' counsel also asked the VE whether an individual in this region of the country would have more than moderate exposure to heat and cold on some days getting from the parking lot to the building.  Tr. 52-53.  The VE responded that, yes, an individual "would be exposed to heat and cold."  Tr. 53.  Adams' counsel then asked "So, the job duties would not expose a person moderately to heat or, or cold, but the layout of the parking lot, plant, and so on, may require – such exposure?"  Tr. 53.  The VE stated "yes" and the ALJ then asked Adams how often he left the house, to which Adams responded "Daily. I mean --."  Tr. 53.

11

Adams' counsel questioned the VE about the document preparer position and the VE's statements that he believed that a majority of the work was not burning documents to CDs rather than microfilming.  Tr.  53-54.  The VE agreed that, with burning documents to CDs, a scanner and computer may be involved.  Tr. 54.  Noting that he had not studied the issue of whether the possible use of computer software for a document preparer might push the position from unskilled to semi-skilled, the VE felt that, barring problems with intellectual functioning, 30 days should be a sufficient amount of time for an individual to learn the position.[10]  Tr. 54-55.

In response to questioning from Adams' counsel as to whether having to use a breathing machine at work would require an accommodation, the VE indicated that, if someone needed to use a breathing machine at work, he would need to get permission from his employer and there would need to be space allocated for him to use the machine.  Tr. 56-57.

The VE indicated that the jobs he listed in response to the first hypothetical could require occasional use of stairs depending upon the layout of the workplace.  Tr. 58.

In terms of absences, the VE indicated that, after a probationary period, an employer would generally tolerate two absences or tardies without a threat of termination.  Tr. 58-59. When an individual starts to consistently miss three or more days or is tardy three or more days in a month, usually the individual would be terminated and not considered competitively employable.  Tr. 59.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which

---

[10] Adams does not allege a mental impairment. Tr. 31.

can be expected to result in death or which has lasted or can be expected to last for a continuous

period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or
> mental impairment or impairments are of such severity that he is not only unable
> to do his previous work but cannot, considering his age, education, and work
> experience, engage in any other kind of substantial gainful work which exists in
> the national economy[11] . . . .

42 U.S.C. § 423(d)(2)(A).

 In making a determination as to disability under this definition, an ALJ is required to

follow a five-step sequential analysis set out in agency regulations.  The five steps can be

summarized as follows:

1.      If the claimant is doing substantial gainful activity, he is not disabled.

2.      If claimant is not doing substantial gainful activity, his impairment must
        be severe before he can be found to be disabled.

3.      If claimant is not doing substantial gainful activity, is suffering from a
        severe impairment that has lasted or is expected to last for a continuous
        period of at least twelve months, and his impairment meets or equals a
        listed impairment,[12] claimant is presumed disabled without further inquiry.

4.      If the impairment does not meet or equal a listed impairment, the ALJ
        must assess the claimant's residual functional capacity and use it to
        determine if claimant's impairment prevents him from doing past relevant
        work.  If claimant's impairment does not prevent him from doing his past
        relevant work, he is not disabled.

5.      If claimant is unable to perform past relevant work, he is not disabled if,
        based on his vocational factors and residual functional capacity, he is
        capable of performing other work that exists in significant numbers in the
        national economy.

---

[11] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the
region where such individual lives or in several regions of the country."  42 U.S.C. § 423(d)(2)(A).

[12] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P,
App. 1, and describes impairments for each of the major body systems that the Social Security Administration
considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age,
education, or work experience.  20 C.F.R. § 404.1525.

20 C.F.R. §, 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).  Under this

sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v.

Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner

at Step Five to establish whether the claimant has the RFC and vocational factors to perform

work available in the national economy.  *Id.*

### IV. The ALJ's Decision

In his January 13, 2012, decision, the ALJ made the following findings:[13]

1.    Adams had not engaged in substantial gainful activity since at least July 12, 2010, the application date.  Tr. 12.

2.    Adams had the following severe impairments: chronic obstructive pulmonary disease (COPD)/asthma, obesity, history of congenital esophageal repair and reflux, and gastroesophageal reflux disease (GERD).  Tr. 12.  The following were non-severe impairments: Adams' neck, back and pelvis conditions.[14]  Tr. 12.

3.    Adams did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. Tr. 12-13.

4.    Adams had the RFC to perform sedentary work with lifting and carrying up to 10 pounds occasionally, standing and walking for 2 hours in an 8-hour workday, sitting for 6 hours in an 8-hour workday, no climbing of ladders, ropes and scaffolds, occasional climbing of ramps and stairs, occasional balancing, no stooping, kneeling, crouching and crawling, avoid even moderate exposure to extreme heat and cold, avoid even moderate exposure to wetness and humidity, avoid even moderate exposure to pollutant irritants, such as dust, odors, gases and fumes, and must avoid all exposure to moving machinery and unprotected heights. Tr. 13-15.

5.    Adams had no past relevant work. Tr. 15.

---

[13] The ALJ's findings are summarized.

[14] Although non-severe impairments, the ALJ noted that he considered both severe and non-severe impairments in reaching his decision.  Tr. 12.

6.       Adams was born in 1964 and was 46 years old, which is defined as a younger individual age 18-49, on the date the application was filed. Tr.15.

7.       Adams had at least a high school education and was able to communicate in English. Tr. 15.

8.       Transferability of job skills was not material to the determination of disability. Tr. 15.

9.       Considering Adams' age, education, work experience and RFC, there were other jobs that existed in significant numbers in the national economy that Adams could perform, including document preparer, touch-up screener, and patcher. Tr. 16.

Based on the foregoing, the ALJ determined that Adams had not been under a disability since July 12, 2010, the date the application was filed. Tr. 16-17.

## V. Parties' Arguments

### A.       Plaintiff's arguments

Adams presents five arguments for review. He contends that the ALJ erred because: (1) he found that Adams could perform the jobs listed by the VE but that finding was inconsistent with the VE's testimony because the VE indicated that the jobs he listed would require some stooping or employer accommodation; (2) the VE testified that the use of a breathing machine at work would require an employer accommodation but the ALJ made no finding about whether Adams would need to use a breathing machine at work; (3) the VE denied that the listed jobs matched the hypothetical, i.e., the VE stated one occupation would expose the individual to an odor and all jobs would expose the individual to temperature extremes when the individual travelled from the parking lot to his workstation in bad weather; (4) he provided no explanation in his decision for rejecting the opinion of consultative examining physician Dr. Feser that Adams should never use stairs; and (5) the ALJ erred in giving "little weight" to the opinion of treating physician Dr. Birney. Doc. 16; Doc. 19.

**B.**      **Defendant's arguments**

In response, the Commissioner argues that substantial evidence supports the ALJ's weighing of the medical opinion evidence, including the opinions of Dr. Feser and Dr. Birney. Doc. 18, pp. 8-9.  The Commissioner also argues that the ALJ's RFC assessment is supported by substantial evidence (Doc. 18, pp. 9-12) and that the VE's testimony constituted substantial evidence in support of the ALJ's finding at Step Five (Doc. 18, pp. 12-13).

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

**A.      The ALJ properly considered and explained the weight provided to the October 11, 2001, opinion of treating physician Dr. Birney**

While recognizing that Dr. Birney's October 11, 2001, opinion regarding Adams' employability is an opinion on an issue reserved to the Commissioner, Adams argues that the ALJ improperly gave "little weight" to Dr. Birney's opinion because the ALJ failed to apply the factors set forth in 20 C.F.R. § 416.927(d).  Doc. 16, pp. 10-11; Doc. 19, pp. 9-10.

Under the treating physician rule, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (citing 20 C.F.R. § 404.1527(d)(2)).  If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight.  *Wilson*, 378 F.3d at 544.  Further, when deciding the weight to be given, an ALJ must consider factors such as (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors that tend to support or contradict the opinion.  *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. § 416.927(c).

On October 11, 2001, Dr. Paul K. Birney, M.D., authored a letter stating,

Lee Adams has been a patient of mine for over 15 years.  He has severe, chronic aspiration pneumonia with difficulty swallowing due to a congenital defect of his esophagus.  He, at present, is unable to be employed and would not be likely to be able to be employed in the future.

Tr. 199.

The ALJ clearly considered Dr. Birney's opinion but found it was entitled to "little weight." Tr. 15. More particularly, in weighing Dr. Birney's opinion, the ALJ stated,

> Much earlier [10/11/2001], a treating source Paul Briney [sic], M.D. opined claimant was unemployable; however, time, and new and material evidence discredit Dr. Briney's [sic] opinion such that it is given little weight [see SSR 96-2p]. Issues as [to] disability and RFC are reserved for the Social Security Commissioner [20 CFR 416.927(e)(1) and (2)].

Tr. 15.

As noted by the ALJ, opinions as to disability, i.e., employability, are reserved to the Commissioner and therefore are not entitled to special significance. *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007) (citing 20 C.F.R. § 404.1527(e)(3) (2006); SSR 96–5p, 1996 WL 374183 (July 2, 1996)). Adams acknowledges that Dr. Birney expressed an opinion reserved to the Commissioner but contends that, under SSR 96-5p, the ALJ was still required to consider the opinion, including Dr. Birney's opinion that Adams had "severe, chronic aspiration pneumonia with difficulty in swallowing due to a congenital defect in his esophagus" by applying all the factors under 20 C.F.R. § 416.927(d). Doc. 16, pp. 10-11; Doc. 19, pp. 9-10. However, contrary to Adams' contention, consistent with the regulations, the ALJ considered and sufficiently explained that he was affording "little weight" Dr. Birney's opinion because of the age of the opinion as well as the lack of supportability and consistency of Dr. Birney's opinion with new and material evidence. Tr. 15. These reasons are supported by substantial evidence.

For example, the ALJ discussed and considered medical record evidence showing that Adams' current treating physician, Dr. Iqbal, denied his request for a disability placard. Tr. 13. The ALJ also discussed and considered that Adams was on Albuterol for his asthma/COPD. Tr. 14. However, the ALJ also considered the fact that most of Adams' emergency room visits were for neck, back and hip pain. Tr. 14. Additionally, when Adams called Dr. Iqbal thinking he

had pneumonia, Adams declined to come in for an x-ray.  Tr. 13.   The ALJ's discussion of the evidence and explanation for the weight provided to Dr. Birney's opinion is sufficiently clear to allow this Court an opportunity to review the decision and determine that the ALJ properly found Dr. Birney's opinion discredited based on new and material evidence.  Adams also has failed to demonstrate the ALJ's reasons for providing "little weight" were not "good reasons" or are not supported by substantial evidence.

Moreover, while an ALJ's decision must include "good reasons" for the weight provided, the ALJ is not obliged to provide "an exhaustive factor-by-factor analysis."  *See Francis v. Comm'r of Soc. Sec.*, 414 Fed. Appx. 802, 804 (6th Cir. 2011).  Thus, to the extent that the ALJ did not specifically discuss each and every factor in 20 C.F.R. 416.927(d), the Court finds no error with respect to the ALJ's consideration of and weight provided to Dr. Birney's 2001 opinion.

Adams also argues that the ALJ should have given more weight to Dr. Birney's opinion because Dr. Birney was the treating physician when the Agency previously found Adams disabled and that the ALJ erred because he failed to compare the medical evidence from his prior period of disability, i.e., 1996-2006, to the medical evidence relevant to Adams' current application.  Doc. 16, pp. 10-11; Doc. 19, pp. 9-10.  Adams, thus, suggests that, because the Agency previously granted benefits and terminated those benefits not because of an improvement in his condition but because of excess resources, the ALJ should have given more weight to Dr. Birney's opinion and/or the prior Agency determination.  Doc. 19, pp. 9-10.  The ALJ addressed this claim and found it unpersuasive stating,

> I look at this case de novo [fresh] and I am not bound by the Agency's prior grant at the initial determination level.  In the instant case, since the date of filing [07/12/2010], claimant's limited treatment for his esophageal condition and essentially normal physical examinations allows me to reasonably find that

> claimant's condition has medically improved such that he was capable of sedentary work, as set forth in the RFC finding.

Tr. 14.  Although Adams disagrees with the ALJ's ultimate conclusion regarding what, if any, weight the ALJ should have afforded the Agency's prior disability finding and/or the weight to be provided to Dr. Birney's 2001 opinion, Adams has failed to demonstrate that the ALJ failed to consider the evidence or sufficiently explain the weight provided to that evidence.

Accordingly, notwithstanding the Agency's prior disability determination, the Court finds no error with respect to the weight the ALJ assigned to Dr. Birney's opinion or the ALJ's explanation of the weight provided to that opinion.

**B.      The ALJ properly considered the opinion of consultative examining physician Dr. Christina Feser**

Adams argues that the ALJ erred with respect to his consideration of consultative examining physician Dr. Feser's opinion. Doc. 16, p. 10.  He claims that Dr. Feser stated that Adams could never use stairs but the ALJ did not mention Dr. Feser's opinion or explain why he rejected the limitation on stair climbing.  Do. 16, p. 10.  Adams contends that the ALJ's failure to do so affected the outcome because the VE stated that the listed occupations could involve occasional use of stairs.  Doc. 16, p. 10.

As a one-time examining physician, Dr. Feser did not have an ongoing treatment relationship with Adams and therefore her opinion was not entitled to deference or controlling weight under the treating physician rule.  *See Kornecky v. Comm'r of Soc. Sec*, 167 Fed. Appx. 496, 508 (6th Cir. 2006); *Daniels v. Comm'r of Soc. Sec.,* 152 Fed. Appx. 485, 490 (6th Cir. 2005).   It is the ALJ's responsibility to evaluate the opinion evidence using the factors set forth in 20 C.F.R. § 416.927.  *See* 20 C.F.R. § 416.927(e)(2). However, the ALJ is not obliged to include in his decision an exhaustive factor-by-factor analysis of the factors.  *See Francis*, 414

Fed. Appx. at 804.  Further it is the responsibility of the ALJ, not a physician, to assess a claimant's RFC.  *Poe v. Comm'r of Soc. Sec.*, 342 Fed. Appx. 149, 157 (6th Cir.2009).   In assessing a claimant's RFC, an ALJ "is not required to recite the medical opinion of a physician verbatim in his residual functional capacity finding . . .  [and] an ALJ does not improperly assume the role of a medical expert by assessing the medical and nonmedical evidence before rendering a residual functional capacity finding."  *Id.*

Here, although Dr. Feser was not a treating physician, the ALJ, consistent with the regulations, properly considered and weighed her opinion when considering the evidence and assessing Adams' RFC.  Tr. 14-15.  For example, the ALJ discussed Dr. Feser's evaluation and opinion, noting that, on examination by Dr. Feser, Adams' lungs were clear to auscultation and percussion bilaterally with distant breath sounds, a musculoskeletal examination was unremarkable, and a neurological was normal other than positive straight leg raises.  Tr. 14, 332.  The ALJ also noted that Dr. Feser's RFC, in relevant part, included limitations of lifting/carrying 20 pounds occasionally and 10 pounds frequently; siting for 8 hours in an 8-hour day; standing for 2 hours in an 8-hour day; and walking for 1 hour in an 8-hour day.  Tr. 14, 339.

Also in her RFC assessment, Dr. Feser offered her opinion regarding Adams' ability to climb stairs.  In one section of the MSS, Dr. Feser checked a box indicating that Adams could never climb stairs and ramps, with a notation that he was limited because of obesity, dyspnea and reflux with aspiration.  Tr. 341.  In another section of the MSS, Dr. Feser checked a box indicating that Adams could "climb a few steps at a reasonable pace with the use of a single handrail."  Tr. 343.   Adams takes issue with the ALJ's failure to explicitly state why he did adopt Dr. Feser's opinion that Adams could never climb stairs or ramps.  Doc. 16, p. 10; Doc. 19, pp. 8-9.

However, a review of the decision makes clear that the ALJ considered Dr. Feser's opinion along with her examination findings, weighed her opinion, and assessed Adams' RFC in light of the weight he provided to that opinion.  For example, as noted by the ALJ, Dr. Feser's musculoskeletal examination of Adams was unremarkable and, other than positive straight leg raises, Adams' neurological examination was normal, including a steady, symmetric gait and no need for an assistive device.  Tr. 14, 332.  Further, while the ALJ did not explicitly state that he was not adopting Dr. Feser's limitation of no stair climbing, he stated that he gave weight to "Dr. Feser's physical RFC assessment consistent with . . . [the ALJ's] RFC finding." Tr. 14.  In accordance therewith, the ALJ restricted Adams to sedentary work which was consistent with the portions of Dr. Feser's opinion that the ALJ specifically noted.  Tr. 13, 14.   Further, the RFC included limitations of no stooping, kneeling, crouching and crawling which were also consistent with Dr. Feser's opinion.  Tr. 13, 341.   While the ALJ did not restrict Adams to no climbing of stairs and ramps, he did restrict Adams to occasional climbing of stairs.  Tr. 13.

As noted above, Dr. Feser's opinion with respect to Adams' ability to climb stairs was internally inconsistent.  *Compare* Tr. 341 *with* Tr. 343.  In light of the inconsistencies in Dr. Feser's opinion with respect to Adams' ability to climb stairs as well as her relatively normal examination findings, Adams has not demonstrated that the ALJ's decision to limit Adams to occasional stair climbing rather than to no stair climbing is not supported by substantial evidence.  Moreover, the ALJ's decision makes clear that the ALJ considered and weighed Dr. Feser's opinion.   Accordingly, based on the foregoing, the Court finds no error with the ALJ's consideration of and explanation of the weight provided to Dr. Feser's opinion.  Thus, reversal and remand is not warranted for further consideration of Dr. Feser's opinion.

C.      **The ALJ properly considered and assessed the credibility of Adams' testimony**

Adams acknowledges that the ALJ discussed Adams' testimony regarding his use of a breathing machine but argues that the ALJ failed to evaluate or provide a reason for discrediting that testimony.  Doc. 16, p. 8; Doc. 19, pp. 5-7; Tr. 14.

SSR 96–7p and 20 C.F.R. § 416.929 describe a two-part process for assessing the credibility of an individual's subjective statements about his or her symptoms.  First, the ALJ must determine whether a claimant has a medically determinable physical or mental impairment that can reasonably be expected to produce the symptoms alleged; then the ALJ must evaluate the intensity and persistence associated with those symptoms to determine how those symptoms limit a claimant's ability to work.

When evaluating the intensity and persistence of a claimant's symptoms, consideration is given to objective medical evidence and other evidence, including: (1) daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (5) treatment, other than medication, received for relief of pain or other symptoms; (6) any measures used to relieve pain or other symptoms; and (7) other factors concerning functional limitations and restrictions due to pain or other symptoms.  20 C.F.R. § 416.929(c); SSR 96–7p, 1996 WL 374186, at 3 (July 2, 1996).  "[A]n ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility.  Nevertheless, an ALJ's assessment of a claimant's credibility must be supported by

substantial evidence." *Calvin v. Comm'r of Soc. Sec.*, 437 Fed. Appx. 370, 371 (6th Cir. 2011)

(citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir.1997)).

Here, after detailing Adams' testimony, including his testimony regarding the use of a

breathing machine, the ALJ stated "after careful consideration of the evidence, particularly the

claimant's limited treatment for his esophageal condition and essentially his normal physical

examinations . . . [his] statements concerning the intensity, persistence and limiting effects of . . .

[his] symptoms are not credible to the extent they are inconsistent with my RFC assessment." Tr.

14.  Additionally, the ALJ indicated that Adams' "complaints of ongoing problems with

breathing and fatigue [being] so severe as to prevent him from lifting or carrying much, or

sleeping, or doing much during the day . . . are not supported by treating or examining opinion or

objective medical evidence . . .".  Tr. 15.

Also, in his decision, the ALJ took note of Adams' counsel's questions regarding Adams'

shortness of breath during the hearing[15] but the ALJ noted that there was no request by Adams or

his counsel to stop the hearing to allow Adams an opportunity to rest or use his inhaler, nor did

the ALJ observe any problems which suggested that he should stop the hearing.  Tr. 15.

Additionally, the ALJ noted that Adams was "fully engaged in the hearing at all times and he

testified without apparent problems."  Tr. 15.

---

[15] During the hearing, Adams' counsel noted to Adams that it appeared that Adams was getting somewhat short of
breath.  Tr. 41.  Adams responded,

> Yes.  I'm getting a little tight.  I had a bad night last night again.  I was up all night.  In fact, I took
> my - - I could have, I could have took  my breathing machine more than once before I came here
> this morning, but I - - unless I have pneumonia or, or I'm, or I'm really, really badly - - it depends
> on the condition, I couldn't slip the second breathing machine in the four hours that it
> recommends.  So, I didn't take it a second time.  But, I took it this morning before I came.

Tr. 41.  Adams' counsel thereafter proceeded to ask Adams questions regarding the length of his bouts with
pneumonia.  Tr. 41.

The foregoing demonstrates that, contrary to Adams' contention, the ALJ clearly discussed and assessed the credibility of Adams' testimony regarding the extent and nature of his breathing problems and need to use a breathing machine.  Tr. 13-14.  In doing so, the ALJ found Adams' allegations regarding the severity of his symptoms not credible to the extent they were inconsistent with the ALJ's RFC assessment.  Tr. 14.  Additionally, the ALJ provided a reasoned explanation for his credibility assessment, i.e., limited treatment for Adams' esophageal condition, essentially normal physical examinations, lack of support from treating or examining opinions, or objective medical evidence.  Tr. 14, 15.

Accordingly, Adams' claim that the ALJ provided no basis for discrediting his testimony is unfounded.  Moreover, Adams has not argued or demonstrated that the ALJ's credibility assessment is not supported by substantial evidence.  In consideration of the deference afforded to an ALJ's credibility assessment and the lack of demonstration by Adams that the ALJ failed to properly consider or evaluate the credibility of Adams testimony, the Court finds that reversal and remand is not warranted for further assessment or evaluation of Adams' testimony, including his testimony that the uses a breathing machine three times each day.   Further, Adams has failed to demonstrate that the ALJ erred by not including in the RFC a limitation for use of a breathing machine at work.

**D.**     **The ALJ properly relied upon the VE's testimony in support of his Step Five finding**

The regulations make clear that a claimant's RFC is an issue reserved to the Commissioner and the ALJ assesses a claimant's RFC "based on all of the relevant evidence" of record.  20 C.F.R. § 416.945(a); 20 C.F.R. § 416.946(c).  "In order for a vocational expert's testimony in response to a hypothetical question to serve as substantial evidence . . . [the] [h]ypothetical questions . . .  need only incorporate those limitations which the ALJ has accepted

25

as credible." *Parks v. Social Sec. Admin.*, 413 Fed. Appx. 856, 865 (6th Cir. 2011) (citing *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 2010) and *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993)).  If the VE "is unable to testify without qualification about the jobs a claimant can perform, the ALJ may not rely on his opinion." *Sias v. Sec'y of Health & Human Serv.*, 861 F.2d 475, 481 (6th Cir. 1988).

Adams argues that the ALJ improperly relied upon the VE's testimony to support his finding that Adams could perform other work in the national economy, including work as a document preparer; touch-up screener, and patcher.  Doc. 16, pp. 7-8, 9; Doc. 19, pp. 4-5, 7-8. More particularly, he argues that (1) the ALJ improperly used the job of touch-up screener as a representative job available to Adams because the RFC provided for avoidance of even moderate exposure to pollutant irritants such as odors and the VE ended up eliminating that job because the job would require use of Freon which would emit an odor; (2) the ALJ improperly concluded that any of the listed jobs would be available because the RFC provided for no stooping and the VE testified that all three jobs might require stooping or an employer accommodation; and (3) the ALJ improperly concluded that any of the listed jobs would be available because the RFC provided for avoidance of even moderate exposure to extreme heat and cold and the VE testified that, in this region, all three jobs would expose a worker to temperature variations when walking from the parking lot to his workstation.  Doc. 16, pp. 7-8, 9; Doc. 19, pp. 4-5, 7-8.

## 1. Limitation regarding avoidance of even moderate exposure to pollutant irritants, such as dust, odors, gases, and fumes

With respect to Adams' argument concerning the VE's elimination of the touch-up screener position, the Commissioner offers no response.  After the VE indicated, in response to questioning by Adams' counsel, that the touch-up screener position would involve exposure to odors from Freon, the ALJ sought to clarify the VE's testimony regarding the availability of the

touch-up screener position.  Tr. 50-51.  Following that additional questioning by the ALJ, the VE explicitly stated that he was eliminating the position of touch-up screener.  Tr. 51.  Accordingly, since the VE eliminated the job of touch-up screener, the Court finds that the ALJ erred with respect to his reliance upon the touch-up screener job.  However, as discussed below, the ALJ properly considered and relied upon the VE testimony regarding the other two jobs, i.e., document preparer and patcher, in finding that there were a significant number of jobs that existed in the national economy that Adams could perform.  Since the combined total number of jobs for document preparer and patcher positions was 775 jobs available regionally, 1,700 statewide, and 42,000 nationwide (Tr. 16, 47-48), even with the elimination of the touch-up screener position there remained a significant number of jobs available.[16]  Thus, the ALJ's error with respect to reliance upon the touch-up screener position was harmless.

### 2.  Limitation of no stooping

With respect to the no stooping limitation, Adams argues that the VE testified that the three identified jobs would require some stooping or accommodation, and per SSR 96-9p, a finding of no stooping will usually lead to a finding of disability.  Doc. 16, pp. 7-8; Doc. 19, pp. 4-5.  While SSR 96-9p instructs that a finding of disability would *usually* apply where there is a limitation of no stooping, SSR 96-9p does not compel a finding of disability where there is a limitation of no stooping.  SSR 96-9p, 1996 SSR LEXIS 6, * 22 (July 2, 1996) (emphasis supplied); *see also Lauer v. Apfel*, 169 F.3d 489, 492 (7th Cir. 1999); *Rosado v. Comm'r of Soc. Sec.*, 2011 WL 5434087, * 4 (N.D. Ohio Nov. 8, 2011).  Instead, the ruling instructs that, where an individual is limited to less than occasional stooping, as in this case, consultation with a

---

[16] There is no special number that denotes a significant number of jobs.  *Hall v. Bowen*, 837 F.2d 272, 275 (6th Cir. 1988).  Upon consideration of various factors, such as the reliability of a vocational expert's testimony, the isolated nature of the jobs, and the reliability of the claimant's testimony, "[t]he decision should ultimately be left to the trial judge's common sense in weighing the statutory language as applied to a particular claimant's factual situation."  *Id.*

vocational expert may be useful. SSR 96-9p, 1996 SSR LEXIS 6, * 22 (July 2, 1996); *see also Lauer*, 169 F.3d at 492; *Rosado*, 2011 WL 5434087, * 4.

Here, in accordance with SSR 96-9p, the ALJ consulted a VE and presented a hypothetical to the VE that described a sedentary worker with limitations including a limitation of no stooping (Tr. 46). *See Rosado*, 2011 WL 5434087, * 4 (in accordance with SSR 96-9p, the ALJ consulted a vocational resource in reaching his decision where the claimant's residual functional capacity precluded stooping). In response, the VE identified three jobs that the described individual could perform. Tr. 47-48. Further, the VE clarified that, based on the characteristics of the three identified jobs, none required stooping. Tr. 49. The ALJ properly relied upon this VE testimony when concluding that Adams would be able to perform the three identified jobs. *Id.; see also Mullens v. Barnhart*, 165 Fed. Appx. 611, 614-615 (10th Cir. 2006) (finding the Commissioner's factual findings were supported by substantial evidence where the VE provided testimony regarding the availability of sedentary jobs that required no stooping).

Adams argues that the VE changed his testimony and eliminated all three jobs based on the no stooping restriction. Doc. 19, pp. 4-5. In support of his argument Adams points to a portion of the VE's testimony wherein the VE stated "Well, I, I mean, literally if they couldn't stoop, I probably would provide an accommodation, one of those picker up things if - -" (Tr. 50) and argues that this testimony demonstrates that VE changed his opinion and eliminated the three identified jobs because of the no stooping restriction. (Doc. 19, pp. 4-5). The Court finds his argument unpersuasive. While the VE stated that, if an individual *literally* could not stoop, the VE would provide an accommodation (Tr. 50-51), the VE's responses were provided following the presentation of a hypothetical scenario involving a worker dropping something and having to pick it up (Tr. 49-50) and the ALJ had already made clear that, based on the characteristics of the

three identified jobs, none required stooping (Tr.  49).  Further, in contrast to the VE's testimony regarding the touch-up screener job where the VE explicitly stated that he would eliminate that job (Tr. 51), the VE did not state that he was eliminating the identified jobs.

Accordingly, since the VE did not explicitly eliminate the three identified jobs and the VE had made clear that none of the three identified jobs required stooping, the ALJ's reliance on the VE testimony regarding the no stooping limitation to support his Step Five finding was proper.

### 3.  Limitation of avoidance of even moderate exposure to extreme heat and cold

Adams contends that, because the VE testified that a worker may be exposed to temperature variations while walking from the parking lot to the building, the ALJ was precluded from relying on the VE's testimony that there would be jobs available to an individual who would be required to avoid even moderate exposure to extreme heat and cold.  Doc. 16, p. 9; Doc. 19, pp. 7-8.   Adams' argument is based on his contention that a provision in Listing 1.00(B)(2)(b) establishes that "Social Security's policy is to consider whether the individual could access the workplace." Doc. 16, p. 9.  Listing 1.00(B)(2)(b) explains what it means to ambulate effectively stating in part, "[t]o ambulate effectively individuals . . . must have the ability to travel . . . to and from a place of employment." Listing 1.00(B)(2)(b).

While the section of the Listing cited by Adams references a need to be able to travel to and from employment, the issue here is not one of ambulation.  Rather, the issue is whether there would be jobs available to an individual who would be required to avoid even moderate exposure to extreme heat and cold.  Thus, the Court finds Adams' reliance upon a provision of a Listing 1.00(B)(2)(b) misplaced and unpersuasive.

Moreover, the RFC and hypothetical question described an individual who would be required to avoid even moderate exposure to *extreme* heat and cold.  Tr. 13, 46.   The VE was not asked whether nor did the VE indicate that walking to and from a parking lot would expose a worker to *extreme* heat or cold. Tr. 52-53 (reflecting that the VE was asked whether a worker would have "more than moderate exposure to heat [and cold] on some days").  In light of the foregoing, the Court also finds Adams' argument unpersuasive because the record itself fails to provide a basis for Adams' argument.

## VII. Conclusion

For the reasons set forth herein, the Court **AFFRIMS** the Commissioner's decision.


Dated:  September 15, 2014

_____
Kathleen B. Burke
United States Magistrate Judge